AO 91 (Rev. 11/11) Criminal Complaint     AUSA Minje Shin (312) 469-6024

**FILED**
3/28/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

RICHEY KING

CASE NUMBER: 25 CR 174

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about March 27, 2025, at Melrose Park, in the Northern District of Illinois, Eastern Division, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | knowingly and intentionally distributed a controlled substance, namely 400 grams or more of a mixture or substance containing a detectable amount of fentanyl |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

*s/Kevin Pollack*
KEVIN POLLACK
Task Force Officer,
Drug Enforcement Administration (DEA)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: March 28, 2025

*Judge's signature*

City and state: Chicago, Illinois     YOUNG B. KIM, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

### AFFIDAVIT

I, KEVIN POLLACK, being duly sworn, state as follows:

1. I am a Task Force Officer with the Drug Enforcement Administration (DEA), and have been so employed since October 2023. My current responsibilities include the investigation of narcotics trafficking offenses.

2. This affidavit is submitted in support of a criminal complaint alleging that Richey KING violated Title 21, United States Code, Section 841(a)(1). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging KING with distribution of a controlled substance, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3. This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, including oral and written reports, documents, and other evidence that I have received directly or indirectly from other law enforcement officers; the results of physical surveillance conducted by other law enforcement officers, which have been reported to me either directly or indirectly; information provided by an undercover law enforcement officer ("UC-1") and a

confidential source ("CS-1")[1]; my review of video and/or audio recordings related to this investigation; my training and experience as a DEA Task Force Officer; and the training and experience of other law enforcement officers with whom I work.

I. FACTS SUPPORTING PROBABLE CAUSE

   a. Summary of Probable cause

4. On or about March 26, 2025, a confidential source ("CS-1") placed recorded telephone communications with Richey KING to set up a fentanyl transaction on behalf of a purported buyer that CS-1 knew. The buyer was an undercover law enforcement officer. In communications documented by CS-1, KING agreed to supply a half kilogram of fentanyl in exchange for $5000.

5. The following day, on or about March 27, 2025, KING agreed to complete the transaction near his residence. Later that day, on or about March 27, 2025, CS-1 arranged to meet KING with UC-1. At the meeting, KING gave a black plastic bag to UC-1. UC-1 opened the black plastic bag which revealed several brick-shaped objects in clear packaging. A sample from one of those packages field-tested positive for the presence of fentanyl.

   b. March 27, 2025 Distribution of Suspected Fentanyl

6. On or about March 26, 2025, a confidential source ("CS-1") told law enforcement officers that he knew a subject by the name of Richey KING who

---

[1] CS-1 was arrested approximately a week ago for possession with intent to distribute cocaine and has been cooperating with law enforcement since his/her arrest. CS-1 is cooperating with law enforcement in exchange for a benefit in his/her potential prosecution. No promises have been made to CS-1. CS-1 is a convicted felon whose prior convictions include burglary, and controlled substance offenses.

currently had a supply of fentanyl. According to CS-1, KING was using a telephone number ending in 0534 (the "KING Phone").

7.  According to text messages documented by CS-1,[2] on or about March 26, 2025, starting at approximately 4:14 p.m., CS-1 exchanged text messages with the KING PHONE as follows:[3]

> CS-1 –Yo yo Remember that shit you told me you ppl wanted to get rid of china [fentanyl]… I got someone looking for it if you still have it lmk
>
> KING – Yea
>
> CS – You remember how much they wanted
>
> KING – Call me FaceTime

8.  At approximately 4:16 p.m., CS-1 placed a FaceTime video call to the KING Phone (which was audio recorded). During a subsequent debrief with law enforcement, CS-1 confirmed KING was the other participant in the FaceTime call. According to CS-1 and the audio recording of the FaceTime call, CS-1 stated that "this just came across the table" while CS-1 displayed a large sum of cash on the video call. KING asked, "What is that?" to which CS-1 replied, "That's bands baby, that's cash,

---

[2] CS-1 documented text messages with KING by taking screenshots of his cellular phone.

[3] The communications summarized in this application are not verbatim transcriptions and do not include references to all topics covered during the conversations. The summaries also do not include reference to all statements made by the speakers on topics described. All quotations are based on preliminary transcriptions of the conversations and the times listed are approximate. At various points, I have included interpretations of words and phrases inside of brackets. These interpretations are based on law enforcement officers' understanding of the conversations, which is based on the content and context of the conversations, their knowledge of the investigation as a whole, their experience and training, and the experience and training of other law enforcement officers in this investigation.

you have never seen so much money." CS-1 continued to state that "one of my guys [in reference to a buyer] is looking for it." The buyer CS-1 had in mind was an undercover law enforcement officer ("UC-1"). KING responded with "I got it [the fentanyl] right now." CS-1 asked "what you want for it," and clarified he was asking about "the fentanyl you said you had. Remember that brick you said you had?" KING responded, "the whole book [one kilogram]?" CS-1 stated, "unless you want to chop it up [break it up into smaller quantities], but he [UC-1] would rather take the whole thing." KING responded, "bro, it's been chopped up. I don't know if there is a book left." CS-1 responded, "figure it out if you think you can make some money off of it." KING then stated, "20 [dollars] a G [gram]." CS-1 responded "nah, he [UC-1] want big, he want to take it back with him." KING asked, "he want the whole book?" CS-1 responded "yeah." King then countered "10 bucks [a gram]."

9. Based on my training and experience, and familiarity with this investigation, in the FaceTime call above, CS-1 asked KING if KING still had a kilogram of fentanyl for sale. CS-1 told KING that he knew a buyer [UC-1] for it. KING stated that he had already broken up the kilogram into smaller quantities and was unsure if he had the entire kilogram. KING ultimately stated that he would charge $10 a gram if the buyer was willing to purchase the whole kilogram (or what remained of it).

10. According to text messages documented by CS-1, CS-1 continued to exchange text messages with the KING Phone after the FaceTime call ended:

4

> CS-1 – When you going to kno? Should I tell him [buyer] to stick around a day or so?
>
> KING – He [in reference to a supplier] got half [a kilogram] left for 5000 [dollars]… Make sure this ain't no police people either man
>
> CS-1 – Quit playing
>
> KING – Im not playing I love my freedom

11. According to text messages documented by CS-1, the following day, on or about March 27, 2025, CS-1 texted the KING Phone multiple times starting at approximately 10:53 a.m., but received no response.

12. According to CS-1 and law enforcement conducting surveillance, later that day, at approximately 2:37 p.m., CS-1 visited KING's residence located at or near the 1500 block of North Caryl Avenue in Melrose Park (the "KING Residence"). CS-1 knocked on the door and KING answered. According to CS-1, KING asked CS-1 if the buyer was ready and CS-1 responded that he was. KING told CS-1 that KING would contact him.

13. According to text messages documented by CS-1, later that afternoon, CS-1 received a message from the KING Phone stating "One hour be ready … 4:30."

14. According to law enforcement conducting surveillance, at approximately 4:47 p.m., a black male wearing a gray and black Nike backpack (Individual A) went into the KING Residence.

15. At approximately 4:48 p.m., about a minute after Individual A went inside the King Residence, CS-1 received a call from the KING Phone, which was

5

recorded by CS-1. KING confirmed he was ready for the deal and directed CS-1 to meet "down the street … by the truck." CS-1 told KING, "give me 10-15 [minutes]."

16. At approximately 4:54 p.m., UC-1 activated a covert audio recording device.

17. According to law enforcement conducting surveillance, at approximately 5:10 p.m., KING exited the KING Residence and entered the driver's seat of a black Jeep bearing Illinois registration EY43023 (the "Jeep"). KING then drove the Jeep slowly around the block before arriving at or near the meeting location agreed upon with CS-1.

18. According to UC-1 and/or law enforcement conducting surveillance, at approximately 5:20 p.m., UC-1 and CS-1[4] arrived in UC-1's vehicle (the "UC Vehicle") and parked near the Jeep. CS-1 told UC-1 that KING was sitting in the Jeep. CS-1, exited the UC Vehicle and entered the Jeep through the front passenger door. UC-1 then approached the Jeep, carrying a backpack, and stood outside the driver's seat of the Jeep. UC-1 identified the driver as Richey KING based on his matching appearance to KING's photograph available on law enforcement databases. UC-1 told KING that he wanted to see the product KING brought. KING then directed UC-1 to enter the Jeep and UC-1 entered the Jeep (with the backpack) through the rear driver side door. KING then handed a black plastic bag to UC-1. UC-1 tore through additional black plastic bags contained therein, which revealed numerous bricked-

---

[4] During this encounter, CS-1 was also equipped with video recording equipment.

shaped chalky objects contained in clear packaging. A photograph of these materials, later seized by law enforcement, is reproduced below.



19. According to UC-1, after examining the items in the black plastic bag, UC-1 placed the black plastic bag into UC-1's backpack. UC-1 then placed the backpack on the front center console of the Jeep and exited the Jeep. UC-1 then walked to the UC Vehicle, and opened the trunk (which was a predetermined signal to surveilling officers to approach). Shortly thereafter, law enforcement officers arrived, placed KING under arrest, and seized the bricked-shaped packages which were still in UC-1's backpack on the front center console.

20. Law enforcement subsequently determined that the bricked shaped packages weighed, in total, approximately 451.2 grams. Law enforcement field tested a sample from one of the packages which tested positive for the presence of fentanyl.

21.     During a recorded post-arrest interview, KING stated that he received the black plastic bag from Individual A when Individual A entered the KING residence.[5] According to KING, when he received the black plastic bag the contents of the plastic bag felt chunky to the touch. KING was of the belief that the black plastic bag contained heroin even though Individual A had told KING that Individual A had a supply of fentanyl. KING also stated that since approximately January of 2025, KING had worked with Individual A to arrange a handful of prior narcotics transactions (each involving approximately 100 grams) in a fashion similar to the transaction on or about March 27, 2025.

---

[5] Prior to the interview, law enforcement read KING his *Miranda* rights, which he verbally waived.

8

## II. CONCLUSION

22. Based on the foregoing facts, I respectfully submit that there is probable cause to believe that, on or about March 27, 2025, at Melrose Park, in the Northern District of Illinois, Eastern Division, Richey KING knowingly distributed a controlled substance, namely 400 grams or more of a mixture or substance containing fentanyl, in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

*s/Kevin Pollack*
KEVIN POLLACK
Task Force Officer, Drug Enforcement Administration

SWORN TO AND AFFIRMED by telephone March 28, 2025.

_____
Honorable YOUNG B. KIM
United States Magistrate Judge

9